UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALAN COLE, VINCENT COLE,
and JORDAN COLE,

        Plaintiffs,

v.

Case No. 09-10941
Hon. Lawrence P. Zatkoff

CITY OF DEARBORN, EDWARD VILLEMAIRE,
RICHARD MICHALSKI, SGT. CONRAD and
OTHER UNKNOWN DEFENDANTS,

        Defendants.
_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on October 22, 2010

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

This matter is before the Court on Defendants' motion for summary judgment [dkt 45]. The parties have fully briefed the motion. The Court finds that the facts and legal arguments are adequately presented in the parties' papers such that the decision process would not be significantly aided by oral argument. Therefore, pursuant to E.D. Mich. L.R. 7.1 (f)(2), it is hereby ORDERED that the motion be resolved on the briefs submitted. For the following reasons, Defendants' motion is GRANTED IN PART and DENIED IN PART.

## II. BACKGROUND

On March 24, 2007, at approximately 5:30 p.m., Alan Cole, Vincent Cole and Jordan Cole ("Plaintiffs"), joined by their friend Antoine Badey, drove to the Fairlane Town Center (a shopping mall located in Dearborn, Michigan) after school. Vincent Cole was wearing a white hooded

sweatshirt. Alan Cole was wearing a blue jacket with no hood. Plaintiffs walked around the mall before walking to the Fairlane Town Center's Star Theater, where they watched a movie. After the movie, Plaintiffs met with two females outside the theater, who joined Plaintiffs in their walk to a restaurant located across the street. They arrived at the restaurant at approximately 9:55 p.m. The restaurant refused to admit Plaintiffs' group because not all of them were over the age of twenty-one. While the six of them walked from the restaurant back to Plaintiffs' car, the group was confronted by the Dearborn Police.

At approximately 10:05 p.m. on that same day, the City of Dearborn Police Department Dispatch received a call from the Fairlane Town Center. The caller identified himself as Officer Kassim of the Fairlane Town Center Security Police. Officer Kassim reported that there was an armed robbery in the Fairlane Town Center's Star Theater parking lot. Officer Kassim stated that the suspects were four black males, one wearing a white hooded sweater, and one wearing a black jacket. Officer Kassim also stated that one of the suspects possibly had a gun on him.

Officer Kassim told the dispatcher that he was watching the suspects walk through the parking lot near the mall's food court on the Fairlane Town Center's closed-circuit security camera system. While still on the line with the dispatcher, Officer Kassim watched the suspects meet with two females and continue to walk towards the bus stop located in the Fairlane Town Center's parking lot near the Star Theater. Officer Kassim continued to give specific directions to the dispatcher in order to lead responding Dearborn police officers directly to the suspects, providing the name of the street the suspects were traveling along and the name of the department store that the suspects were closest to. The Dearborn Police Department's dispatch services relayed this information to all Dearborn police cars in the city.

The first responding officers were Defendants Edward Villemaire and Richard Michalski. The officers had received the information about the armed robbery from the dispatcher on their radio while they drove down Evergreen Road in Dearborn, just two blocks from the Fairlane Town Center. Both officers were fully informed of the Fairlane Town Center Security Police's description of the suspects' physical appearance and location. Villemaire and Michalski state that they found six black juveniles—four males and two females—and that one suspect was wearing a white hooded sweatshirt, thus matching the Fairlane Town Center Security Police's description of the suspects. The Fairlane Town Center Security Police informed Villemaire and Michalski that they had arrived at the exact location of the suspects.

Defendants contend that based on the Fairlane Town Center Security Police's statement that one of the suspects may be armed with a handgun, Villemaire and Michalski ordered the suspects to make their hands visible and to lay down on the ground. According to Defendants, the suspects did not immediately comply. Although the group was not physically aggressive, Villemaire testified that he was fearful, based on prior experience with suspects failing to comply with officers' orders, that the group would attempt to flea. After a period of 5-15 seconds, during which the officers issued several more verbal commands, the suspects complied, lying on the ground while making their hands visible. However, while the officers were securing the scene, one of the suspects began to slide his hands underneath his stomach, purportedly stopping only after the officers made several additional verbal commands.

Villemaire provided cover while Michalski began handcuffing the suspects as they lay on the ground. Other Dearborn police officers soon arrived at the scene and assisted in placing handcuffs on the suspects and frisking them for weapons. By the time Defendant Dearborn Police

3

Sergeant Richard Conrad arrived, the suspects had been handcuffed and separated from one another—some sitting on the ground in the parking lot, and some sitting in the backseats of police cars. Sergeant Conrad instructed the officers to search the immediate area for the handgun reportedly involved in the armed robbery. After no handgun was found, Sergeant Conrad requested that the Fairlane Town Center Security Police bring the victims of the armed robbery to the scene of the stop in order to determine whether Plaintiffs were the actual perpetrators of the robbery. The victims told the officers that Plaintiffs were not the people who had robbed them. Plaintiffs were then released from custody. The stop, from the moment the officers approached Plaintiffs until the moment they were released, lasted fifteen-to-twenty minutes.

Plaintiffs argue that Villemaire and Michalski were the first to arrive at the scene and, with weapons drawn, screamed, "Freeze, niggers. Get on the ground or you die." Plaintiffs contend that they immediately went to the ground and laid on their stomachs and that the officers began searching the group. Jordan Cole was asked where the gun was at, and he purportedly told the officers that none of them had a gun. Alan Cole alleges that as he laid on his stomach with his chin on the ground, one of the officers stomped on his back and held his boot on his neck, which "messed up" Alan Cole's chin and rendered him unable to breathe. Alan Cole also alleges that one of the officers drove his knee into his back while applying handcuffs, and that the officer then dragged him to a police car. Jordan Cole alleges that as he laid on the ground, an officer stomped on his lower back and left him handcuffed on the ground. He also alleges that he suffered shoulder pain after the incident, that his lower back was swollen from being stomped on, and that the pain continued for "awhile" after the incident. Vincent Cole contends that one of the officers deliberately and intentionally stepped on his hand and ground it into the cement, prompting one of the officers to ask

4

him if he needed a band-aid.

After the incident, Plaintiffs walked back to the area in front of the Fairlane Town Center's Star Theater and talked to people about the incident for a couple of minutes before driving home. Plaintiffs allege that once they got home, they informed their mother, Adrian Dupree, of the incident. According to Dupree, she observed the following: (1) Vincent's hand was cut, scraped, and bleeding; (2) Jordan had a footprint on his shirt; and (3) Alan's chin was scraped and cut. She also states that: (1) Alan's neck was sore for one-and-a-half weeks; (2) Jordan's back was sore for a few days; and (3) she treated Alan's and Jordan's injuries with ice and moist heat.

Both Jordan and Alan allege that they had back pain "for a couple weeks" after the incident. Alan also alleges that he stayed home from his job at Art Van Furniture for three days following the incident, but does not allege that he did so at the instruction of a doctor or his employer. Jordan claims that he stayed home from school for a week following the incident, but his school's records do not indicate any such absences. Dupree thereafter made an appointment with a Dr. Lerner to treat any injuries Plaintiffs may have suffered as a result of the stop. Though the incident occurred on March 24, 2007, medical records indicate that Plaintiffs did not see Dr. Lerner until May 29, 2009. Jordan testified that he is "not sure" whether he saw Dr. Lerner two days after the incident or two-and-a-half years later. Jordan testified that Dr. Lerner gave him a prescription for the pain medication Motrin (a brand of ibuprofen), which he took for "a week, three times a day" but is "not sure" when this happened. Alan testified that Dr. Lerner told him that he had no injuries requiring treatment.

### III. LEGAL STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories,

5

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Thompson v. Ashe*, 250 F.3d 399, 405 (6th Cir. 2001). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact, and all inferences should be made in favor of the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party discharges its burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 325).

Once the moving party has met its burden of production, the burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must "go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citing Fed. R. Civ. P. 56(e)). "[T]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## IV. ANALYSIS

Plaintiffs allege claims under 42 U.S.C § 1983 against the individual Defendants for unreasonable search and seizure and excessive force, and against Defendant City of Dearborn for municipal liability based on its alleged failure to train and supervise its officers. In deciding

Plaintiffs' claims against the individual Defendants, the Court will first consider whether they are immune from suit.[1]

**A.    QUALIFIED IMMUNITY**

"Under the doctrine of qualified immunity, governmental officials, including police officers, will not be held liable on a plaintiff's claim for civil damages so long as their conduct does not violate clearly established statutory or constitutional rights which the reasonable officer in the defendants' position would have known." *Kostrzewa v. City of Troy*, 247 F.3d 633, 641 (6th Cir. 2001) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To determine whether a defendant is entitled to qualified immunity, the Sixth Circuit has adopted a three-step inquiry: "(1) whether the facts taken in the light most favorable to plaintiff could establish a constitutional violation; (2) whether the right was 'a clearly established' right of which any reasonable officer could have known; and (3) whether the official's actions were objectively unreasonable in light of that clearly established right." *Abel v. Harp*, 278 Fed. Appx. 642, 649 (6th Cir. 2008) (quoting *Risbridger v. Connelly*, 275 F.3d 565, 569 (6th Cir. 2002)).

**1. Constitutional Violation**

*a. Unreasonable Search and Seizure*

The parties dispute whether Defendants conducted an investigatory stop of Plaintiffs, which would have only required the officers to have a reasonable suspicion that crime was afoot, or whether Defendants arrested Plaintiffs, which would have required the officers to have probable cause. However, the Court need not decide this issue. For the reasons provided below, the Court

---

[1] Defendants also seek to dismiss Plaintiffs' state law claims for false arrest and assault and battery. However, the Court finds that since Plaintiffs' state law claims have previously been dismissed, Defendants' motion is moot to the extent it relates to Plaintiff's state law claims.

7

finds that Defendants had probable cause to arrest Plaintiffs, and that the search and seizure of Plaintiffs was therefore reasonable under the Fourth Amendment.

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." "[W]ith respect to police/citizen contact, [the Fourth Amendment guarantees] vest only after [a] citizen has been seized." *United States v. Richardson*, 949 F.2d 851, 855 (6th Cir. 1991). "A seizure occurs where, 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Smoak v. Hall*, 460 F.3d 768, 778 (6th Cir. 2006) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). A seizure becomes an arrest when police actions "go beyond checking out the suspicious circumstances that led to the original [investigatory] stop." *United States v. Obasa*, 15 F.3d 603, 607 (6th Cir. 1994). "A warrantless arrest by an officer is reasonable under the Fourth Amendment when the arrest is in public and there is probable cause . . . ." *Fox v. DeSoto*, 489 F.3d 227, 235-36 (6th Cir. 2007) (*United States v. Watson*, 423 U.S. 411, 417 (1976)). "For probable cause to exist, the facts and circumstances within the officers' knowledge must be sufficient to warrant a man of reasonable caution to believe that an offense had been, was being, or was about to be committed." *Fox*, 489 F.3d at 236 (citing *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949)).

Here, the Fairlane Town Center Security Police informed Defendants that an armed robbery had just taken place in the Fairlane Town Center's Star Movie Theater parking lot, and that they were watching the suspects flee the scene on their closed-circuit security camera system. The Fairlane Town Center Security Police then led Defendants directly to Plaintiffs' location and identified them as the suspects, indicating that there were four black males—one wearing a white

hooded sweater—traveling with two females, and that one of them may have been armed with a gun. Plaintiffs' group consisted of four black males and two females, and Vincent Cole was in fact wearing a white hooded sweatshirt, thus corroborating the information received from the Fairlane Town Center Security Police. Therefore, the Court finds that, at the time of the detainment, the facts and circumstances within Defendants' knowledge were sufficient to warrant a man of reasonable caution to believe that Plaintiffs had committed the offense of armed robbery.

While Plaintiffs argue that probable cause did not exist because Plaintiffs did not commit any crime, and they had no weapons or contraband, this retrospective analysis is irrelevant; whether Defendants had probable cause when they arrested Plaintiffs depends solely on the facts and circumstances within Defendants' knowledge at the time of the arrest. *See Fox*, 489 F.3d at 236. Furthermore, Plaintiffs were detained for no more than twenty minutes—a reasonable period of time for Defendants to secure the scene, search for the gun, and make appropriate inquiries. Under these circumstances, the Court finds that Plaintiffs have failed to produce evidence upon which a reasonable jury could find that Defendants unreasonably searched and seized Plaintiffs in violation of the Fourth Amendment. Accordingly, the Court finds that the individual Defendants are immune from suit with respect to this alleged constitutional violation. *See Abel*, 278 Fed. Appx. at 649 ("If the analysis under the first step suggests that no constitutional violation transpired, then the analysis is complete, and we should grant summary judgment to the defendant.") (citation omitted).

### b. Excessive Force

The Fourth Amendment protects individuals from excessive force by law-enforcement personnel. *Watkins v. City of Southfield*, 221 F.3d 883, 887 (6th Cir. 2000). The Court reviews claims for excessive force under a standard of reasonableness. *Saucier v. Katz*, 533 U.S. 194, 209

(2001). Accordingly, the Court views the use of force from the perspective of a reasonable law-enforcement officer on the scene rather than retrospectively. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). The analysis is to be conducted under the totality of the circumstances and without regard to intentions or motivations. *Id.* at 397. The inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. The Court's analysis must "embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

Here, the Court finds that Plaintiffs have presented facts sufficient for a reasonable jury to believe that Defendants applied excessive force. Although Plaintiffs were believed to have committed an armed robbery, the evidence indicates that at the time Defendants applied force to Plaintiffs, Plaintiffs were laying passively on the ground. Defendants contend that the force was necessary because they were outnumbered, Plaintiffs were slow to comply with their orders, and because one individual in Plaintiffs' group placed his hand underneath his stomach as he laid on the ground. However, the evidence shows that these concerns were resolved prior to Defendants' application of force. At the time when Defendants used force to restrain Plaintiffs, and drag one of them to a police car, there is no evidence to indicate that Plaintiffs were noncompliant, resisting, attempting to evade arrest by flight, or that they posed an immediate threat to Defendants' safety; they were simply laying on the ground with their hands visible as instructed by Defendants. While Defendants question the severity of Plaintiffs' injuries, and take exception with their delay in

seeking medical treatment, the Court finds that this goes to the issue of Plaintiffs' damages, rather than the reasonableness of Defendants' use of force. Viewing the circumstances in a light most favorable to Plaintiffs, a reasonable jury could find that application of force sufficient to cause cuts, scrapes, and soreness for more than a week was unreasonable and in violation of the Fourth Amendment.

### 2. **Clearly Established**

Whether a right is clearly established must be analyzed "in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. "'[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right.'" *Id*. at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "As a general matter, it is clearly established that a suspect possesses a right to be free from the use of excessive force." *Abel*, 278 Fed. Appx. at 651 (citing *Graham v. Connor*, 490 U.S. at 399)).

Under Plaintiffs' version of the events, Defendants had reason to know at a particularized level that the conduct they allegedly engaged in while apprehending and detaining Plaintiffs was unlawful. According to Plaintiffs, they laid passively on the ground while Defendants stomped on one of their backs, drove a knee into another's back, and stepped on another's hand, resulting in cuts, scrapes, and soreness lasting for more than a week. The fact that Plaintiffs' injuries may have been minor does not absolve Defendants. Under the circumstances, a reasonable jury could find that a reasonable official would have understood that Defendants' application of force violated Plaintiffs' Fourth Amendment rights.

11

### 3. Objectively Unreasonable

Next, the Court must determine whether Plaintiffs have offered "sufficient evidence to indicate that what the official[s] allegedly did was objectively unreasonable in light of the clearly established constitutional right[]." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003). In excessive-force cases, "[a]n officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether the particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." *Saucier*, 533 U.S. at 205.

Here, Plaintiffs' version of the facts indicate no mistake on the part of Defendants in terms of what the law requires. Again, Plaintiffs contend that Defendants applied force while they laid passively on the ground, and that Defendants were aware of their passivity at the time they applied force. *See Abel*, 278 Fed. Appx. at 652 (the defendant's conduct in arresting the plaintiff was objectively unreasonable where the plaintiff alleged that he assumed a primarily passive position, which the defendant was alleged to have been aware of at the time the defendant applied force). While Defendants argue that they were alarmed when an individual in Plaintiffs' group put his hand under his stomach, that individual removed his hand from under his stomach according to Defendants' orders before the alleged application of force. Furthermore, evidence is lacking to suggest that Plaintiffs were otherwise noncompliant, aggressive, or resisting, such that it was necessary for Defendants to apply the alleged force. Therefore, the Court concludes that genuine issues of material fact exist with respect to whether Defendants' actions were objectively unreasonable under the circumstances.

### 4. Conclusion

Due to genuine issues of material fact with respect to whether the individual Defendants' application of force was excessive under the circumstances, the Court finds that the individual Defendants are not immune from suit and that Plaintiffs have presented evidence sufficient to have this claim heard by a jury. Thus, Defendants' motion for summary judgment is denied with respect to Plaintiffs' excessive force claim.

### B. MUNICIPAL LIABILITY

Generally, a municipality cannot be held liable under 42 U.S.C. § 1983 on the theory of *respondeat superior*. Municipal liability lies only when injuries inflicted are done pursuant to the municipality's policy or custom. *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). In order to state a claim under the theory of municipal liability, a plaintiff must "identify the policy, connect the policy to the City itself and show that a particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993).[2]

### 1. Failure to Train

"The [City] is liable under § 1983 for failure to train if the Plaintiff[s] can prove three elements: (1) 'that a training program is inadequate to the tasks that the officers must perform'; (2) 'that the inadequacy is the result of the [City]'s deliberate indifference'; and (3) 'that the inadequacy is 'closely related to' or 'actually caused' [Plaintiffs'] injur[ies].'" *Plinton v. County of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (quoting *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989) (citing *City of Canton v. Harris*, 489 U.S. 378, 389-91 (1989))). "To show deliberate indifference,

---

[2] Since the individual Defendants are entitled to summary judgment with respect to Plaintiffs' claim for unreasonable search and seizure, the discussion of municipal liability pertains only to Plaintiffs' excessive force claim.

Plaintiff[s] 'must show prior instances of unconstitutional conduct demonstrating that the [City] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'" *Plinton*, 540 F.3d at 464 (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)). "In the alternative, 'a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability.'" *Plinton*, 540 F.3d at 464 (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997)).

Here, Plaintiffs present no evidence with respect to Defendant City of Dearborn's training program, nor do Plaintiffs offer any explanation as to why they believe the training program is inadequate. Thus, Plaintiffs have failed to demonstrate facts that would allow a reasonable jury to conclude that Defendant City of Dearborn is liable under § 1983 for failing to train its officers.

### 2. Failure to Supervise

A municipality may be liable for failing to supervise its officers if it can be shown that such failure was a deliberate or conscious choice by the municipality. *Kammeyer v. City of Sharonville*, No. 01-00649, 2006 U.S. Dist. LEXIS 24058, at *33–34 (S.D. Ohio Apr. 26, 2006) (citing *City of Canton*, 489 U.S. at 389)). "Determining whether deliberate indifference is present in failure to train or supervise cases involves applying an objective rather than subjective standard." *Kammeyer*, 2006 U.S. Dist. LEXIS 24058, at *34 (citing *Farmer v. Brennan*, 511 U.S. 825, 841 (1970)).

Plaintiffs argue that Defendant City of Dearborn failed to supervise its officers by deliberate or conscious choice based on the following allegations: (1) Michalski testified that he has had a previous lawsuit alleging his use of excessive force; (2) Michalski was involved in a criminal matter where charges of felonious assault, felony firearm, and brandishing a weapon were made; and (3)

Villemaire testified that while he was a police officer, he has been sued four times—one case involving excessive force and another involving false arrest. Notably, Plaintiffs do not provide the Court with any evidence regarding the outcomes of, or the extent of the individual Defendants' involvement in, the above mentioned civil and criminal proceedings. Plaintiffs offer no other evidence in support of their failure to supervise claim. As a result, the Court finds that Plaintiffs have failed to demonstrate facts that would allow a reasonable jury to conclude that Defendant City of Dearborn deliberately or consciously failed to supervise its officers.

### 3. Conclusion

The Court finds that Plaintiffs have failed to demonstrate the existence of a genuine issue of material fact regarding their claim for municipal liability. Accordingly, the Court grants Defendants' motion for summary judgment with respect to Plaintiffs' claims against Defendant City of Dearborn.

## V. CONCLUSION

Accordingly, for the above stated reasons, IT IS HEREBY ORDERED that Defendants' motion for summary judgment [dkt 45] is GRANTED IN PART and DENIED IN PART.

IT IS SO ORDERED.

S/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated: October 22, 2010

CERTIFICATE OF SERVICE

       The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on October 22, 2010.

                                  S/Marie E. Verlinde
                                  Case Manager
                                  (810) 984-3290